# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-05-00730-CR

**Arnaldo Aleman Gomez, Appellant**

**v.**

**The State of Texas, Appellee**

### FROM THE DISTRICT COURT OF COMAL COUNTY, 22ND JUDICIAL DISTRICT
### NO. CR2002-297, HONORABLE GARY L. STEEL, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

The jury convicted Arnaldo Aleman Gomez of three counts of engaging in organized criminal activity and one count of marihuana possession in an amount of more than four ounces but less than five pounds. *See* Tex. Penal Code Ann. § 71.02(a)(5) (West Supp. 2006); Tex. Health & Safety Code Ann. § 481.121 (West 2003). The district court assessed punishment at 45 years' imprisonment for the offense of engaging in criminal activity and 20 years' imprisonment for the offense of marihuana possession. In five points of error, Gomez challenges the legal sufficiency of the evidence and asserts that the district court abused its discretion in denying his motion to suppress, limiting his cross-examination during the suppression hearing and during trial, admitting certain photographic evidence, and admitting hearsay testimony in violation of his right to confront the witnesses against him. We affirm the judgment.

**BACKGROUND**

Beginning in September 2001, the Comal County Sheriff's Office, working with the Comal County Metro Narcotics Task Force, investigated possible criminal activity—specifically, the possession and distribution of illegal drugs—at a residence located at 2035 West Bridge Street in New Braunfels. The suspected participants in the criminal activity were Arnaldo Gomez, his brother Rodolfo, and their sister Sandra.[1]

The jury heard testimony from a confidential informant who assisted the police in their investigation. On September 11, December 7, December 11, and December 12, 2001, the informant participated in four "controlled buys" in which he arranged to purchase drugs from the suspects under the direction and surveillance of police officers. The informant testified that the buys took place at the residence in question and that he "scored" heroin during each buy. The informant explained that during the first buy, he was unsure who the seller was, although he thought it was Arnaldo. During the second buy, however, the informant was able to identify the seller as "Nando Gomez." In court, the informant was shown a picture of Arnaldo, and he identified him as the person from whom he had purchased narcotics. The informant testified that he did not remember much about the last two buys, except that during the last buy he purchased drugs from Rodolfo.

The police officers involved in the buys were Detective Juan Guerrero, Officer Enrique Sanchez, and Officer Adam Pastrano. Each testified during trial about their observations during the buys. Detective Guerrero and Officer Sanchez conducted surveillance and served as

---

[1] Because the suspects share the same last name, we will refer to them using their first names.

2

backup to Officer Pastrano, who transported the informant to and from the residence where the buys took place. During the first buy, Pastrano and the informant traveled to the location in the informant's vehicle, a "white, work-type van," and during subsequent buys they traveled to the location in an unspecified and unmarked "undercover vehicle that belongs to the task force." Pastrano testified that they parked "[i]n front of the residence" during the buys. The informant always exited the vehicle while Pastrano remained inside. In a separate unmarked vehicle, Guerrero and Sanchez followed Pastrano and the informant to the residence but parked "in a different location" and "from a distance to watch for safety reasons."[2] Guerrero and Sanchez testified that during the buys, their focus was primarily on Pastrano's safety and that their observations of the buys were limited. Therefore, the State relied primarily on Pastrano's testimony about his observations during the buys. During the first buy, Pastrano testified that he was unable to identify the person with whom the informant came into contact, although Pastrano did "believe it was a male subject." During the second buy, Pastrano was able to observe the person's face and features, but he was unsure about the person's identity. He believed it may have been Rodolfo. Pastrano testified that during the third buy, he again could not identify the subject, although he "could see that it was a male that [the informant] made contact with" and could see "enough" of the individual that he believed it was Arnaldo, although he was not "100 percent sure." During the fourth buy, Pastrano testified that he had a better view of the transaction and, this time, he was "100 percent sure" that the subject was Arnaldo.

---

[2] Guerrero was not able to recall exactly where he and Sanchez were parked during the buys, and whether they were parked "on Bridge Street or one of the side streets." Sanchez testified that they were "pretty far" removed from the residence, although they "stayed in the same block."

On December 12, 2001, following the last buy, Detective Guerrero obtained a search warrant for the residence. The next morning, police officers executed the search warrant on the house. The jury heard evidence that several individuals were found inside and taken into custody, including Arnaldo, Rodolfo, and Sandra. The jury also heard evidence that the police found quantities of illegal drugs inside the house—19.34 grams of heroin, 26.50 grams of cocaine, 2.35 grams of methamphetamine, and 4.04 pounds of marihuana. The police also seized several firearms, surveillance cameras, a digital scale, a box of unused syringes, and individual syringes that were found "throughout the house." The State referred to the residence as a "shooting gallery" where users could both purchase and use illegal drugs. The jury also heard evidence that money found in a safe located in a bedroom closet and seized during the search of the residence contained serial numbers that matched the serial numbers on money that the informant had been given by the police to make the buys.[3]

Deed records and a utility bill in Sandra's name admitted into evidence suggested that Sandra owned the house. Other evidence established that Arnaldo and Rodolfo lived at the residence. During the search, police found their driver's licenses and certain bills addressed to them. The address listed on the documents matched the address of the house. Additionally, Michael Wencka, a paramedic with the City of New Braunfels, testified that he provided medical treatment to Arnaldo on July 20, 2001, and that Arnaldo had reported to Wencka during the treatment that his

---

[3] Detective Guerrero testified that this money is commonly referred to as "imprest money."

address was "2035 West Bridge, New Braunfels, Texas."[4]  Wencka also testified that Arnaldo told him that he had used "approximately $40 worth of heroin" earlier in the day.

Pictures of the three suspects were admitted into evidence.  Some of the pictures showed that Arnaldo and Sandra had markings on their arms.  Officer Sanchez identified these markings as "track marks" from "shooting heroin."  Arnaldo objected to the admission of the pictures of the track marks, arguing that the pictures were irrelevant and more prejudicial than probative.  The district court overruled the objections.  Additionally, over a hearsay objection by defense counsel, Officer Sanchez testified that Petra Gaytan, one of the other individuals who was arrested during the search of the residence, told Sanchez that "she shot heroin" and that "track marks" on her arms were the result of heroin injections.

The jury convicted Arnaldo of engaging in organized criminal activity and possession of marihuana.  Arnaldo elected to have the district court assess punishment.  After finding the enhancement paragraphs alleged in the indictment to be true,[5] the district court sentenced Arnaldo to 45 years' imprisonment for the offense of engaging in criminal activity and 20 years' imprisonment for the offense of marihuana possession.  This appeal followed.[6]

---

[4]  The medical treatment was in response to an incident during which, according to Wencka, Arnaldo may have been the victim of an assault.

[5]  The indictment alleged that in 1975 and 1990, Arnaldo was convicted of aggravated robbery with a deadly weapon.

[6]  Arnaldo first filed his notice of appeal on July 30, 2003.  This Court dismissed the appeal for want of jurisdiction after finding that Arnaldo filed his notice of appeal late. *See Gomez v. State*, No. 03-03-00454-CR, 2003 Tex. App. LEXIS 6920 (Tex. App.—Austin Aug. 14, 2003, no pet.). Arnaldo then filed a petition for writ of habeas corpus, alleging that his counsel was ineffective in failing to timely file his notice of appeal.  The court of criminal appeals granted Arnaldo an out-of-time appeal, and he filed a new notice of appeal with this Court on November 9, 2005.

## DISCUSSION

**Evidentiary sufficiency**

We first address Arnaldo's contention in his fifth point of error that the evidence was legally insufficient to support his conviction for engaging in organized criminal activity.[7]

When there is a challenge to the legal sufficiency of the evidence to sustain a criminal conviction, we consider whether a rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Vodochodsky v. State*, 158 S.W.3d 502, 509 (Tex. Crim. App. 2005). We review all the evidence in the light most favorable to the verdict and assume that the trier of fact resolved conflicts in the testimony, weighed the evidence, and drew reasonable inferences in a manner that supports the verdict. *See Rollerson v. State*, 227 S.W.3d 718, 724 (Tex. Crim. App. 2007); *Shams v. State*, 195 S.W.3d 346, 347 (Tex. App.—Austin 2006, pet. ref'd) (citing *Griffin v. State*, 614 S.W.2d 155, 159 (Tex. Crim. App. 1981)). It is not necessary that every fact point directly and independently to the defendant's guilt; it is enough if the conclusion is warranted by the combined and cumulative force of all the incriminating circumstances. *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007) (citing *Johnson v. State*, 871 S.W.2d 183, 186 (Tex. Crim. App. 1993)). We must consider all the evidence, rightly or wrongly admitted, that the trier of fact was permitted to consider. *See Conner v. State*, 67 S.W.3d 192, 197 (Tex. Crim. App. 2001).

---

[7] Although Arnaldo also asserts in the heading of this point that there is insufficient evidence that he possessed marihuana, the arguments and authorities in his brief are limited to the offense of engaging in organized criminal activity. Therefore, we find Arnaldo's assertion of insufficient evidence of marihuana possession to be inadequately briefed. *See* Tex. R. App. P. 38.1(h).

A person commits the offense of engaging in organized criminal activity if, with the intent to establish, maintain, or participate in a combination or the profits of a combination, he commits or conspires to commit unlawful manufacture, delivery, dispensation, or distribution of a controlled substance or dangerous drug. Tex. Penal Code. Ann. § 71.02(a)(5). "Combination" means three or more persons who collaborate in carrying on criminal activities. *Id*. § 71.01(a) (West 2003). In other words, to convict Arnaldo of engaging in organized criminal activity, the State needed to prove beyond a reasonable doubt that Arnaldo intended to commit, with at least two other persons, the unlawful manufacture, delivery, dispensation, or distribution of a controlled substance or dangerous drug.

Arnaldo argues that "the State failed to prove that he and the members of some group intended to work together in a continuing course of criminal activities." Specifically, Arnaldo contends that there is insufficient evidence that he participated in more than one criminal transaction and that Sandra participated in any of the transactions.[8] We disagree.

The jury heard evidence that there were four "controlled buys" between the informant and a male subject that occurred at the suspected residence. The informant testified that during the first buy, he "thought" the seller was Arnaldo. The informant also testified that during the second buy, the seller was a man by the name of "Nando Gomez." In court, the informant identified this man as Arnaldo. Furthermore, Officer Pastrano testified that during the third buy, he could see "enough" of the subject that he believed it was Arnaldo, although he was not "100 percent" certain. Pastrano also testified that, during the fourth buy, he was able to get a closer view of the subject and

---

[8] Arnaldo does not contest the evidence of Rodolfo's involvement in the criminal activity.

7

he was "100 percent sure" that the subject was Arnaldo. Although the informant and Pastrano provided conflicting identifications concerning the second and fourth buys (Pastrano testified that he believed the subject during the second buy was Rodolfo and the informant testified that Rodolfo sold drugs to him during the fourth buy), reconciliation of any conflicts in the evidence is within the exclusive province of the jury. *See Jones v. State*, 944 S.W.2d 642, 647 (Tex. Crim. App. 1996). The jury was free to believe that Pastrano was mistaken about the seller's identity during the second buy and/or that the informant was mistaken about the seller's identity during the fourth buy. Furthermore, there was no conflicting testimony about the seller's identity during the first and third buys. Viewing the evidence in the light most favorable to the verdict, the jury could have rationally found that Arnaldo was the seller during at least two of the four buys. The jury could have also rationally inferred Arnaldo's involvement in the criminal activity from the photographic evidence of track marks on Arnaldo's arms.

As for Sandra's alleged participation, although there was no evidence presented that she directly participated in any of the controlled buys, the jury could have rationally inferred her involvement in the criminal activity from the photographic evidence of track marks on her arms, from deed records and a utility bill in her name admitted into evidence, which suggested that she owned the residence where the buys took place, and from the fact that she was found inside the residence when the raid occurred. There was also evidence that Arnaldo and Rodolfo, besides being merely present at the residence when the raid occurred, permanently lived there. Specifically, there was evidence that Arnaldo provided a paramedic with the address of the residence when the

8

paramedic asked Arnaldo where he lived, and bills and driver's licenses found at the residence during the raid that belonged to Arnaldo and Rodolfo contained the address of the residence.

Inside the residence where Arnaldo, Rodolfo, and Sandra were found, the police seized what a rational jury could infer was considerable evidence of organized criminal activity, including 19.34 grams of heroin, 26.50 grams of cocaine, 2.35 grams of methamphetamine, 4.04 pounds of marihuana, several firearms, surveillance cameras, drug paraphernalia, including an unused box of syringes and individual syringes, and the imprest money that was used during the controlled buys. The jury could rationally infer from this evidence that all three siblings were both aware of and actively involved with the unlawful manufacture, delivery, dispensation, or distribution of a controlled substance or dangerous drug. We thus conclude that the evidence is legally sufficient to establish beyond a reasonable doubt that Arnaldo engaged in organized criminal activity. We overrule Arnaldo's fifth point.

**Motion to suppress**

In his first point of error, Arnaldo argues that the district court abused its discretion in denying his motion to suppress the search warrant. Arnaldo contends that the affidavit supporting the warrant contained insufficient and/or false information that failed to establish probable cause to search the residence.

An application for a search warrant must be supported by an affidavit setting forth substantial facts establishing probable cause. Tex. Code Crim. Proc. Ann. arts. 1.06 (West 2005), 18.01(b) (West Supp. 2006). The facts submitted to the magistrate must be sufficient to justify a conclusion that the object of the search is probably on the premises at the time the warrant is issued.

9

*Cassias v. State*, 719 S.W.2d 585, 587 (Tex. Crim. App. 1986); *State v. Delagarza*, 158 S.W.3d 25, 26 (Tex. App.—Austin 2005, no pet.). The sufficiency of the affidavit is determined by considering the totality of the circumstances set forth within the four corners of the document. *Illinois v. Gates*, 462 U.S. 213, 234 (1983); *Delagarza*, 158 S.W.3d at 26. The issuing magistrate's determination of probable cause must be given great deference and will be sustained if the magistrate had a substantial basis for concluding that a search would uncover evidence of wrongdoing specified in the warrant. *Gates*, 462 U.S. at 236; *Swearingen v. State*, 143 S.W.3d 808, 811 (Tex. Crim. App. 2004); *Delagarza*, 158 S.W.3d at 26. "It is not our task, nor was it the task of the district court, to determine de novo whether the search warrant affidavit stated probable cause to search [the location in question], but only to ensure that the issuing magistrate had a substantial basis for concluding that probable cause was shown." *Delagarza*, 158 S.W.3d at 29 (citing *Gates*, 462 U.S. at 239; *Swearingen*, 143 S.W.3d at 810; *State v. Bradley*, 966 S.W.2d 871, 876 (Tex. App.—Austin 1998, no pet.)). "The resolution of doubtful or marginal cases should largely be determined by the preference to be accorded to warrants." *Id*.

The affidavit need not reflect the direct personal observations of the affiant so long as the magistrate is informed of some of the underlying circumstances supporting the affiant's belief that any informant involved, whose identity need not be disclosed, was credible or his information reliable. *United States v. Ventresca*, 380 U.S. 102, 108 (1965); *State v. Ozuna*, 88 S.W.3d 307, 310 (Tex. App.—San Antonio 2002, pet. ref'd). Although an informant's veracity, reliability, and basis of knowledge are highly relevant in reviewing the sufficiency of an affidavit, these elements are not each independent requirements, but closely intertwined issues that simply

illuminate the overall question of whether there is probable cause to believe that contraband or evidence is located in a particular place. *Ozuna*, 88 S.W.3d at 310. An affidavit may also rely on information received through an informant if the statement is reasonably corroborated by other matters within the officer's knowledge. *Id.* Further, the magistrate may draw reasonable inferences so long as the affidavit is interpreted in a common sense and realistic manner. *Lagrone v. State*, 742 S.W.2d 659, 661 (Tex. Crim. App. 1987); *Ozuna*, 88 S.W.3d at 310.

In this case, the affidavit was sworn by Detective Guerrero (the "affiant"). In relevant part, the affidavit described the suspected residence at 2035 West Bridge Street in New Braunfels and then provided the following information to the magistrate:

> The Suspected Party(s) [Arnaldo and Rodolfo] are known by your AFFIANT to be affiliated with the Texas prison / street gang the Mexican Mafia. . . .
>
> IT IS THE BELIEF OF YOUR AFFIANT THAT SAID SUSPECTED PARTY(S) HAS POSSESSION OF AND IS CONCEALING AT SAID SUSPECTED PLACE IN VIOLATION OF THE LAWS OF TEXAS THE FOLLOWING DESCRIBED PERSONAL PROPERTY, TO WIT:
>
> Contraband in the form of but not limited to . . . [c]ontrolled substances possessed in violation of the Texas Health & Safety Code, namely HEROIN.
>
> . . . .
>
> The grounds for issuance of this warrant are derived from physical evidence, investigations and discussions between investigators, as well as intelligence derived through the utilization of a Confidential Informant.
>
> Your AFFIANT states that the facts, which establish probable cause necessary for the issuance of a search warrant for the above-described location, are as follows:
>
> Your AFFIANT has utilized the assistance of a Confidential Informant to develop intelligence regarding the activities of narcotic traffickers in the New Braunfels/Comal County area. The Confidential Informant has provided information

11

with the understanding that he/she would be considered for a financial reward if the information proved to be valid. I believe that it adds to the Confidential Informant's credibility in this instance because he/she will not benefit if his/her information does not prove to be valid. I explained to the Confidential Informant that it jeopardizes his/her opportunity for reward if law enforcement believes or discovers that he/she has provided incorrect information in a bad faith attempt to obtain a reward. The Confidential Informant's statement to your AFFIANT that the information is true enhances the probability that the information is correct.

This Confidential Informant has provided information that has been factual, and personally corroborated by your AFFIANT [sic]. Your AFFIANT has corroborated the Confidential Informant's information through the use of surveillance, government records, checks, debriefings, and actual purchases of narcotics. On Wednesday, the 12th day of December 2001, your AFFIANT conferred with a representative of the NEW Braunfels UTILITIES of New Braunfels, Texas, and was told that the Suspected Place is presently listed in the name of SANDRA GOMEZ, and has been since 07/30/01. Your AFFIANT has knowledge that SANDRA GOMEZ, white female, 03/14/61, is the sister of the Suspected Party(s).

This Confidential Informant has a thorough knowledge in the identification of HEROIN and various methods, in which it is packaged, handled and secreted. The Confidential Informant wishes to remain anonymous for his/her own personal safety. Your AFFIANT affirms upon oath that he knows that this Confidential Informant is both credible and reliable.

On three (3) separate occasions,[9] the Confidential Informant made supervised purchases of HEROIN at the Suspected Place. Each supervised purchase consisted of the following: your AFFIANT and the Confidential Informant met at a pre-arranged location. Prior to each supervised purchase, the Confidential Informant was thoroughly searched by your AFFIANT and was found not to be in possession of any contraband. The Confidential Informant was provided with photocopied Sheriff's Office Imprest monies, for the purpose of purchasing a quantity of HEROIN. Your AFFIANT as well as undercover officers followed the Confidential Informant to the Suspected Place. After a short period of time, your AFFIANT observed the confidential Informant depart the Suspected Place. Your AFFIANT and other undercover officers would then meet with the Confidential Informant at a pre-arranged location. Your AFFIANT would confirm that a purchase of a quantity of

---

[9] Detective Guerrero testified that he did not mention the fourth buy in the affidavit because he believed that he had sufficient information to support a finding of probable cause after the third buy.

HEROIN was successful by the Confidential Informant from said suspected place. The Confidential Informant informed your AFFIANT that the Suspected Party(s) possessed additional quantities of HEROIN at the Suspected Place. On all three (3) occasions, your AFFIANT field-tested the suspected HEROIN using Ferguson Test Kits. Each test displayed a brownish reddish color, indicating positive for HEROIN.

Your AFFIANT has knowledge that the New Braunfels Crime Stoppers Hotline has received information about ongoing narcotics dealing at the suspected Place within the past three (3) months. Your AFFIANT has corroborated this information through an ongoing investigation.

Within the past seventy-two (72) hours, the Confidential Informant arrived at the Suspected Place and observed the suspected parties in possession of a quantity of HEROIN. . . .

We find that the above affidavit contains sufficient information within its four corners to provide the issuing magistrate with a substantial basis for concluding that controlled substances could be found at the suspected residence. The affidavit informed the magistrate that a confidential informant made three supervised purchases of heroin at the suspected place. Prior to each purchase, Guerrero "thoroughly searched" the informant, and the informant was not found to be in possession of any contraband. Guerrero and other officers followed the informant to the suspected place and observed the informant depart the suspected place. Guerrero then met with the informant and confirmed that the purchase took place. The substance obtained during the purchases tested positive for heroin. The informant also informed Guerrero that the suspects possessed additional quantities of heroin at the suspected place and that, within the past 72 hours, he had arrived at the suspected place and observed the suspects in possession of heroin.

"While information from an unnamed informant alone does not establish probable cause, the informant's tip combined with independent police investigation may provide a substantial

13

basis for the probable-cause finding." *Davis v. State*, 144 S.W.3d 192, 200 (Tex. App.—Fort Worth 2004, pet. ref'd). The affidavit in this case provided that there was an independent police investigation, and the information gleaned from the confidential informant was just one part of that investigation. Specifically, the affidavit provided that "[t]he grounds for issuance of this warrant are derived from physical evidence, investigations and discussions between investigators, *as well as intelligence derived through the utilization of a Confidential Informant.*" (Emphasis added). According to the affidavit, this investigation included procedures to ensure the reliability of the controlled buys (searching the informant prior to the buy, observing the informant during the buy, and meeting with the informant after the buy) and obtaining information that the suspected place belonged to Sandra Gomez, that Sandra was the sister of suspects Arnaldo and Rodolfo, that the New Braunfels Crime Stoppers Hotline had received information about ongoing narcotics dealing at the suspected Place within the past three months, and that Arnaldo and Rodolfo were affiliated with the "Mexican Mafia," a "Texas prison / street gang."

Again, the sufficiency of the affidavit is determined by considering the "totality of the circumstances" set forth within the four corners of the document. *Gates*, 462 U.S. at 234. Considering in their totality the information provided by the confidential informant, the procedures used by the police before, during, and after the controlled buys, the evidence obtained about the utilities of the residence being under the name of Sandra Gomez and Sandra's relationship to the suspected parties, the information obtained from the Crime Stopper's Hotline, and the information about the suspects being affiliated with the Mexican Mafia, we conclude that

14

the affidavit provided the magistrate with a substantial basis for concluding that there was probable cause to issue the search warrant.

However, in his motion to suppress, Arnaldo asserted that the affidavit contained "deliberate falsehoods" and demonstrated a "reckless disregard for the truth." He asked for a hearing pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978). In the hearing on the motion to suppress, the district court allowed Arnaldo to present evidence that went beyond the four corners of the affidavit.

In *Franks*, the Supreme Court held:

> [W]here the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request. In the event that at that hearing the allegation of perjury or reckless disregard is established by the defendant by a preponderance of the evidence, and, with the affidavit's false material set to one side, the affidavit's remaining content is insufficient to establish probable cause, the search warrant must be voided and the fruits of the search excluded to the same extent as if probable cause was lacking on the face of the affidavit.

*Id*. at 156. In other words, for information within the affidavit to be set aside, it is not enough for the defendant to prove that the information is false; the defendant must prove by a preponderance of the evidence that the affiant provided the magistrate false information "knowingly and intentionally" or with "reckless disregard for the truth." *See Massey v. State*, 933 S.W.2d 141, 146 (Tex. Crim. App. 1996).

Because the trial court is the sole finder of fact at a *Franks* hearing and may believe or disbelieve any or all of the testimony presented, we are to view the evidence in the light most favorable to the trial court's ruling and determine if the trial court abused its discretion.

15

*See Washington v. State*, 902 S.W.2d 649, 655 (Tex. App.—Houston [14th Dist.] 1995, pet. ref'd) (citing *Taylor v. State*, 604 S.W.2d 175, 177 (Tex. Crim. App. 1980)); *see also Johnson v. State*, 68 S.W.3d 644, 652-53 (Tex. Crim. App. 2002) (holding that in search and seizure issues reviewing courts are to give "almost total deference" to a trial court's rulings on questions that turn on an evaluation of witness credibility and demeanor).

Arnaldo asserts that the following statements in the warrant were false: (1) that Guerrero knew that Arnaldo and Rodolfo were affiliated with the Mexican Mafia; (2) that Guerrero personally corroborated the information provided by the confidential informant; (3) that Guerrero knew the confidential informant was credible and reliable; and (4) that Guerrero personally searched the confidential informant prior to each controlled purchase. We will address each statement in turn.

### Affiliation with the Mexican Mafia

Guerrero stated in the affidavit that the suspects were "known" to be affiliated with the Mexican Mafia. During the hearing on the motion to suppress, Detective Guerrero was asked about his knowledge of this affiliation:

Q:      What did you mean to Judge Chapman when you used the word "affiliated" with the Texas prison street gang, the Mexican Mafia?

A:      When I say "affiliated," I mean after conferring with other investigators that have more experience than I, they had received numerous information from numerous people that these individuals were affiliated or associated with the Mexican Mafia.

Q:      What personal knowledge do you have to having made that statement to Judge Chapman, that they are affiliated with the Mexican Mafia?

A:      Again, I'm relying on information given to me by more experienced officers.

16

Q:   You don't have any personal knowledge that my client is a member of the Mexican Mafia, do you?

A:   Not personal knowledge. I'm relying on information given to me.

The statement that Arnaldo and Rodolfo were "known" by Guerrero to be affiliated with the Mexican Mafia should be set aside only if Arnaldo proved by a preponderance of the evidence that Guerrero knew the statement was false or made it with "reckless disregard for the truth." On this record, the district court could have found that Arnaldo did not meet this burden. Guerrero testified that he was provided information from "more experienced officers" that Arnaldo and Rodolfo were affiliated with the Mexican Mafia. Guerrero did not state in the affidavit that he had "personal" knowledge of the affiliation, only that he had knowledge. The district court could have determined from Guerrero's testimony that Guerrero had a good-faith belief that the knowledge that he had obtained from more experienced officers was sufficient for purposes of the affidavit, and such a finding would not be an abuse of discretion.

### *Personal corroboration*

Guerrero also stated in the affidavit that "[t]his Confidential Informant has provided information that has been factual, and personally corroborated by your AFFIANT [sic]." Arnaldo asserts that this was a false statement in that "[t]here was no personal corroboration by any of the officers." However, Guerrero testified that he did corroborate the information about the suspects' involvement in the alleged criminal activity using the methods listed in the affidavit: "use of surveillance, government records checks, debriefings, and actual purchases of narcotics." In his testimony, Officer Sanchez confirmed that Guerrero personally supervised the investigation. Based

17

on this evidence, the district court could have found that the statement that Guerrero personally corroborated the information was true.

### *Knowledge of informant's credibility and reliability*

Guerrero further affirmed in the affidavit "that he knows that this Confidential Informant is both credible and reliable." Arnaldo asserts in his brief that "Guerrero testified that he had no actual way of attesting to this [informant's] credibility and reliability having never utilized him in the past and having not actually personally corroborated the transactions." This is not an accurate summary of Guerrero's testimony. Guerrero testified that this investigation was the first time he had used the informant and that he had only known the informant two weeks prior to the investigation. However, Guerrero did not testify that "he had no actual way of attesting to this [informant's] credibility and reliability." In fact, there is no testimony in the record establishing that Guerrero's statement about credibility and reliability was either true or false. The burden was on Arnaldo to prove by a preponderance of the evidence that this statement was false and that it was made with knowledge of its falsity or with reckless disregard for the truth, and on this record the district court would not have abused its discretion in finding that Arnaldo did not meet this burden.

### *Personal search of the informant*

Finally, Guerrero stated in the affidavit that "[p]rior to each supervised purchase, the Confidential Informant was thoroughly searched by your AFFIANT and was found not to be in possession of any contraband." Guerrero admitted during the hearing that he did not personally search the informant prior to each search and that the statement in the affidavit that he did search the

18

informant was "incorrect." Based on this testimony, the district court could have found that this statement was false. However, the district court also could have found that Arnaldo failed to prove that Guerrero made this statement with knowledge of its falsity or with reckless disregard for the truth. Guerrero explained that he was in charge of the investigation, and although he did not personally search the informant prior to each buy, either he or another officer did. The district court could have found from this testimony that Guerrero believed that the informant had been thoroughly searched by either himself or another peace officer prior to each buy. Furthermore, when asked during the hearing why he had represented to the magistrate that he had searched the informant, Guerrero testified that he was not "trying to shortcut the procedure." He testified that he simply made a "mistake." The district court could have chosen to believe Guerrero's testimony.

In summary, viewing the evidence at the hearing in the light most favorable to the district court's ruling, we conclude that the district court did not abuse its discretion in denying Arnaldo's motion to suppress.

Furthermore, even if the district court had found that the above statements were false and struck the statements from the affidavit, there would still be sufficient information within the four corners of the affidavit to support the finding of probable cause, including the information about the procedures used before, during, and after the controlled buys, the information obtained from Crime Stoppers, the information about the residence belonging to the sister of the suspects, and the information about the substance obtained during the purchases testing positive for heroin. We overrule Arnaldo's first point.

**Cross-examination of witnesses**

In his second point, Arnaldo asserts that the district court abused its discretion during the suppression hearing in limiting his cross-examination of the magistrate who issued the search warrant and, during trial, in limiting his cross-examination of Officer Sanchez.

We review a trial court's decision to limit cross-examination for abuse of discretion. *Carroll v. State*, 916 S.W.2d 494, 498 (Tex. Crim. App. 1996). The trial court retains wide latitude to impose reasonable limits on cross-examination to prevent harassment, prejudice, confusion of the issues, harm to the witness, and repetitive or marginally relevant interrogation. *Id*. at 498 (citing *Delaware v. Van Arsdall*, 475 U.S. 673, 682 (1986)).

During the hearing on the motion to suppress, Arnaldo attempted to ask the magistrate—a county-court-at-law judge—questions about her state of mind when issuing the warrant and "what she would have done" if she had known that this was the first time the officers had used this particular confidential informant. The State objected to these questions as irrelevant and speculative. The district court sustained the objections, and we conclude that the district court did not abuse its discretion in doing so. The issue before the district court at the hearing on the motion to suppress was whether the search warrant affidavit contained insufficient or false information supporting a finding of probable cause. Questions about the magistrate's thoughts at the time she issued the warrant or whether she would have issued the warrant had the affidavit contained different information were not relevant to that issue.

Arnaldo contends that in order to determine if the affidavit contained false information, it was necessary to go beyond the four corners of the affidavit. However, it is the

20

state of mind of the affiant, not the magistrate, that is relevant to determining whether material in the affidavit should be set aside. *See Franks*, 438 U.S. at 156 (holding that statements in affidavit should be set aside if *affiant* provides false statements knowingly, intentionally, or with reckless disregard for the truth). Arnaldo's questions to the magistrate were not relevant to the issue of the affiant's state of mind.

With respect to the cross-examination of Officer Sanchez during trial, Arnaldo asserts that the district court allowed Sanchez to testify to hearsay statements made by Petra Gaytan, one of the other individuals who was arrested during the raid of the residence, and that his cross-examination of Sanchez concerning these statements "was difficult because there was no confrontation of Petra Gaytan, as of yet." It is difficult to discern the exact nature of Arnaldo's complaint from his brief. To the extent he is asserting a Confrontation Clause violation, we address that contention below under his fourth point of error. To the extent he is asserting a violation of his right to cross-examine Sanchez on the hearsay statements to which Sanchez testified, we find that no such violation occurred. The district court did not limit Arnaldo's cross-examination of Sanchez on issues relating to Gaytan's statements. In fact, the testimony at issue related to "track marks" found on the arms of heroin users, and Arnaldo asked several questions of Sanchez during cross-examination about these track marks. There is no indication in the record that the district court "effectively denied [Arnaldo] the opportunity to challenge the veracity" of Sanchez's testimony. To the extent Arnaldo's cross-examination of Sanchez may have been "difficult" due to Gaytan's absence from trial, that is a separate issue relating to the Confrontation Clause that we address below. We overrule Arnaldo's second point.

21

**Admission of photographic evidence**

In his third point, Arnaldo contends that the district court abused its discretion in admitting photographic evidence of "track marks" on Arnaldo's arms. During trial, Arnaldo argued that the photographs were irrelevant and more prejudicial than probative. *See* Tex. R. Evid. 401, 403.[10] The district court overruled the objections.

We review a trial court's decision to admit or exclude evidence for abuse of discretion. *Oprean v. State*, 201 S.W.3d 724, 726 (Tex. Crim. App. 2006) (citing *Martinez v. State*, 867 S.W.2d 30, 39 (Tex. Crim. App. 1993)). Unless the trial court's decision was outside the "zone of reasonable disagreement," an appellate court should uphold the ruling. *Id*. (citing *Montgomery v. State*, 810 S.W.2d 372, 391 (Tex. Crim. App. 1991)).

Rule 401 provides that evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tex. R. Evid. 401. The State argues that evidence of track marks on Arnaldo's arms is relevant to the issue of whether Arnaldo was involved with the criminal activity that was allegedly occurring at the suspected residence. We agree. Officer Sanchez testified that track marks on a person's arms were the result of heroin use. During the raid on the residence, police officers discovered 19.34 grams of heroin on the premises, along with numerous

---

[10] On appeal, Arnaldo also contends that the admission of the photographs violates rule 404(b), relating to extraneous offense evidence. *See* Tex. R. Evid. 404(b). However, because Arnaldo did not object to the evidence on this basis during trial, he has failed to preserve error on this issue. *See Carmona v. State*, 941 S.W.2d 949, 957 (Tex. Crim. App. 1997) (holding that point of error on appeal must correspond to objection made at trial); *Lockhart v. State*, 847 S.W.2d 568, 573 (Tex. Crim. App. 1992) (explaining error preservation under rule 404(b)); *see also* Tex. R. App. P. 33.1(a).

syringes that Sanchez testified were commonly used to "shoot heroin." Evidence of track marks on Arnaldo's arms makes his alleged involvement with the criminal activity at the residence more probable than it would be without the evidence. Therefore, we conclude that the district court did not abuse its discretion in finding that the evidence was relevant.

Arnaldo also argued at trial that the evidence, even if relevant, was more prejudicial than probative. Rule 403 provides, "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence." Tex. R. Evid. 403. "In evaluating the trial court's determination under rule 403, a reviewing court is to reverse the trial court's judgment 'rarely and only after a clear abuse of discretion,' recognizing that the court below is in a superior position to gauge the impact of the relevant evidence." *Russo v. State*, 228 S.W.3d 779, 799 (Tex. App.—Austin 2007, no pet. h.) (citing *Mozon v. State*, 991 S.W.2d 841, 847 (Tex. Crim. App. 1999)). A proper rule 403 analysis includes, but is not limited to, the following factors: (1) the probative value of the evidence; (2) the potential to impress the jury in some irrational, yet indelible, way; (3) the time needed to develop the evidence; and (4) the proponent's need for the evidence. *Erazo v. State*, 144 S.W.3d 487, 489 (Tex. Crim. App. 2004). Although the proponent of evidence usually has the initial burden of showing that the evidence is relevant and admissible, because rule 403 "strongly favors" the admissibility of evidence, the opponent of the evidence bears the burden of showing that the probative value is "substantially outweighed" by countervailing factors.

23

*See Russo*, 228 S.W.3d at 799-800 (citing 1 Steven Goode et al., *Texas Practice: Guide to the Rules of Evidence*, § 403.1 (3d ed. 2002)).

In this case, the probative value of the evidence was significant, because the alleged criminal activity was the possession and distribution of illegal drugs, and the evidence seized at the residence included 19.34 grams of heroin and syringes commonly used to inject heroin into the user's arms. Therefore, photographic evidence suggesting that Arnaldo "shot heroin" had a tendency to connect him to the criminal activity. Having reviewed the photographs, we also find that their potential to impress the jury in an irrational way was minimal, as was the time needed to develop the evidence. The only factor that we find weighs against admissibility is the State's need for the evidence, as there was already sufficient evidence in the record connecting Arnaldo to the criminal activity. However, we find that the balance of factors weighs in favor of admissibility and conclude that Arnaldo did not satisfy his burden of demonstrating that the probative value of the evidence was "substantially outweighed" by the danger of unfair prejudice. Therefore, we hold that the district court did not abuse its discretion in admitting the photographs.

Furthermore, even assuming that the photographs were erroneously admitted, any error would be harmless. The erroneous admission of evidence is nonconstitutional error. *Johnson v. State*, 967 S.W.2d 410, 417 (Tex. Crim. App. 1998). Nonconstitutional error that does not affect substantial rights must be disregarded. *See* Tex. R. App. P. 44.2(b). Substantial rights are not affected by the erroneous admission of evidence if the appellate court, after examining the record as a whole, has fair assurance that the error did not influence the jury, or had but a slight effect. *Motilla v. State*, 78 S.W.3d 352, 355 (Tex. Crim. App. 2002). As explained above, there was

sufficient evidence in the record supporting Arnaldo's guilt apart from the photographs of the track marks on his arms. Officer Pastrano testified that he observed Arnaldo with the informant during at least two of the controlled purchases of heroin, and the informant testified that during at least two of the purchases, Arnaldo was the person from whom he had purchased heroin. Arnaldo was also found inside the residence where considerable evidence of heroin use was discovered during the raid, and other evidence established that Arnaldo lived at the residence. Additionally, EMS paramedic Michael Wencka testified that on the day he provided medical treatment to Arnaldo, when Wencka asked Arnaldo if he had recently consumed any alcohol or narcotics, Arnaldo told Wencka that earlier in the day he "did approximately $40 worth of heroin." Thus, prior to the admission of the photographs, the jury had already heard evidence of Arnaldo's alleged heroin use. *See Brooks v. State*, 990 S.W.2d 278, 287 (Tex. Crim. App. 1999) (holding that any error in admitting evidence is harmless in light of other properly admitted evidence proving the same fact). We overrule Arnaldo's third point.

**Alleged Confrontation Clause violation**

In his fourth point, Arnaldo argues that the district court abused its discretion in admitting Officer Sanchez's testimony about statements made to him by Petra Gaytan, a person arrested at the residence who refused to testify during trial. Arnaldo contends that this testimony violated his constitutional right to confront the witnesses against him. *See* U.S. Const. amend. VI; Tex. Const. art. 1, § 10. We review alleged violations of the Confrontation Clause de novo. *See Wall v. State*, 184 S.W.3d 730, 742-43 (Tex. Crim. App. 2006); *Muttoni v. State*, 25 S.W.3d 300, 304 (Tex. App.—Austin 2000, no pet.); *see also Lilly v. Virginia*,

527 U.S. 116, 137 (1999) (stating that courts should "independently review" whether out-of-court statements violate Confrontation Clause).

During Officer Sanchez's testimony, the following exchange relating to Petra Gaytan occurred:

[Prosecutor]:      Did you have a conversation with Petra Gaytan at the jail on that day after she was arrested?

[Sanchez]:      Yes, I did.

[Prosecutor]:      And during the course of that conversation, did you and she discuss the marks on her arms?

. . . .

[Sanchez]:      Yes.

[Prosecutor]:      Did you ask her what caused the marks or what are the marks?

[Sanchez]:      Yes.

[Prosecutor]:      What did she say?

[Sanchez]:      She said that she shot heroin.

[Prosecutor]:      And as a result of shooting heroin—what do you mean by shooting heroin. . . .

[Sanchez]:      Okay. . . . [W]hat she means by shooting heroin is she injects heroin with syringes into her arms.

[Prosecutor]:      The fact that she injects heroin into her arms, does that do anything to the arm?

[Sanchez]:      Yes.

[Prosecutor]:      What?

26

| | |
|---|---|
| [Sanchez]: | It will leave scars. |
| [Prosecutor]: | Is there a common term that is used by people that use narcotics . . . for those scars? |
| [Sanchez]: | Yes. Needle tracks. |
| [Prosecutor]: | Needle tracks? Track marks? |
| [Sanchez]: | Track marks. |

The State contends that Gaytan's statements to Officer Sanchez fall under the "statement against interest" exception to the hearsay rule and are, therefore, admissible. *See* Tex. R. Evid. 803(24). However, whether a statement is admissible under the rules of evidence and whether the same statement is admissible under the Confrontation Clause are separate questions. *See Crawford v. Washington*, 541 U.S. 36, 50-51 (2004); *Wall*, 184 S.W.3d at 734-35. The central question under the Confrontation Clause is whether an out-of-court statement is testimonial or nontestimonial; testimonial statements implicate the Confrontation Clause, while nontestimonial statements do not. *See Davis v. Washington*, 126 S. Ct. 2266, 2273-74 (2006).[11]

However, we need not decide whether Gaytan's statements to Officer Sanchez were testimonial because, even if they were, we conclude that any error in admitting the statements was harmless. "[B]efore a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt." *Chapman v. California*, 386 U.S. 18, 24 (1967); *Davis v. State*, 203 S.W.3d 845, 849 (Tex. Crim. App. 2006), *cert. denied*,

---

[11] We note that Arnaldo was tried in 2003, prior to the Supreme Court's decisions in *Crawford* and *Davis*.

27

127 S. Ct. 2037 (2007); *see also* Tex. R. App. P. 44.2(a). The court of criminal appeals has recently explained that "courts reviewing whether the error in admitting out-of-court statements in violation of *Crawford* is harmless . . . must be convinced, beyond a reasonable doubt, that the admission of *Crawford*-barred testimony would probably not have had a significant impact on the mind of an average juror. Put another way, is there a reasonable possibility that the *Crawford* error, within the context of the entire trial, 'moved the jury from a state of non-persuasion to one of persuasion' on a particular issue?" *Davis*, 203 S.W.3d at 852-53 (citing *Wesbrook v. State*, 29 S.W.3d 103, 119 (Tex. Crim. App. 2000)). Factors to consider in the analysis include: (1) the importance of the hearsay statements to the State's case; (2) whether the hearsay evidence was cumulative of other evidence; (3) the presence or absence of evidence corroborating or contradicting the hearsay testimony on material points; and (4) the overall strength of the prosecution's case. *Id*. at 852.

The hearsay testimony of which Arnaldo complains are Gaytan's statements to Sanchez that "she shot heroin" and that the track marks on her arms were the result of heroin use. This testimony was only incidentally related to Arnaldo's alleged heroin use. Although the State used this testimony to introduce the photographic evidence of track marks on Arnaldo's arms, the State could have introduced this evidence without the hearsay. Immediately after the hearsay testimony, Sanchez testified that he had "worked narcotics for four years" and that he had seen track marks before in prior investigations. Therefore, it is likely that Sanchez could have identified the track marks on Arnaldo's arms even without testimony about Gaytan's statements. Additionally, there was other evidence of Arnaldo's heroin use apart from the photographs of the track marks on his arms. As we explained under Arnaldo's third point, EMS paramedic Michael Wencka testified

28

that when he asked Arnaldo if he had recently consumed any alcohol or narcotics, Arnaldo told Wencka that earlier in the day he "did approximately $40 worth of heroin." Finally, as we have already discussed, the State's case included other evidence connecting Arnaldo to the criminal activity independent of his alleged heroin use, including the informant's testimony that he purchased heroin from Arnaldo, Officer Pastrano's testimony that he observed Arnaldo with the informant during the controlled buys, and the evidence that Arnaldo resided at the location where considerable evidence of drug possession and distribution was discovered. In the context of the entire trial, we conclude that there is not a reasonable possibility that the alleged *Crawford* error "moved the jury from a state of non-persuasion to one of persuasion" on the issue of Arnaldo's guilt. *See id*. at 853. We overrule Arnaldo's fourth point.

## CONCLUSION

We affirm the judgment of the district court.

_____

Bob Pemberton, Justice

Before Chief Justice Law, Justices Patterson and Pemberton

Affirmed

Filed: November 9, 2007

Do Not Publish